UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CUNG HNIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | No. 1:12-cv-00116-SEB-MJD |
| TOA (USA) LLC, ) | |
| ) | |
| Defendant. ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
[Docket No. 43]

This cause is now before the Court on Defendant's Motion for Summary Judgment, filed on July 22, 2013. Plaintiff Cung Hnin brings this claim against his former employer, Defendant TOA (USA) LLC ("TOA"), alleging that TOA terminated him because of his national origin (Myanmar/Chin-speaking) and in retaliation for complaining of discrimination, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").[1] For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**Factual Background**

Mr. Hnin is of Chin ethnicity from Myanmar (formerly Burma). TOA conducts business as an automotive metal stamping company that supplies Subaru and Toyota.

---

[1] In his Complaint, Mr. Hnin also alleged denial of promotion claims under Title VII as well as state law claims for intentional infliction of emotional distress and promissory estoppel. Mr. Hnin now concedes that TOA is entitled to summary judgment on those claims; judgment shall be entered accordingly.

1

Mr. Hnin began working at TOA's facility located in Mooresville, Indiana, in February 2007 as a temporary associate employed by Staffmark. In August 2007, TOA hired Mr. Hnin as its own full-time associate in the Stamping Department. Mr. Hnin worked the evening shift and performed "handwork," which consisted of inspecting stamping parts for defects and re-working defective parts using air-powered hand grinders and buffers. He also worked as a press assistant on production presses where he caught parts from a conveyor belt as they were discharged from the production presses, conducted spot inspections of the parts, and placed the parts in pallets.

**Defendant's Policies**

Upon being hired, all TOA associates, including Mr. Hnin, received an employee handbook which included the company's standards of conduct. With regard to TOA's disciplinary policies, the handbook provides that the company "endorses a policy of progressive discipline in which it attempts to provide associates with notice of deficiencies and an opportunity to improve." Capps Dep. Exh. 2 at 209 (emphasis removed). However, the handbook identifies some infractions that TOA considers serious enough to warrant probation or dismissal without prior warning, including a violation of TOA's sexual harassment policy, which provides:

> TOA (USA) is committed to providing a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal opportunities and prohibits discriminatory practices, including sexual harassment. Accordingly, TOA (USA) expects that all relationships among persons will be business-like and free from bias, prejudice and harassment.
>
> Unwelcome sexual conduct that interferes with an individual's job performance or creates an intimidating, hostile, or offensive environment is

> prohibited.  All associates are prohibited from engaging in unwelcome sexual conduct or making unwelcome sexual overtures, whether verbal or physical.
>
> Behavior that constitutes sexual harassment is unacceptable in the workplace and in any work-related setting outside the workplace, including business-related social events.
>
> TOA (USA) encourages reporting of all perceived incidents of sexual harassment, regardless of the offender's identity or position and regardless of whether the offender works for TOA (USA), a client or a supplier.  TOA (USA) encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken.
>
> All complaints of harassment will be investigated promptly.  Associates are required to cooperate in any investigation, which may include individual interviews with the parties involved, and, where necessary, with individuals who may have observed an alleged harassment or may have relevant knowledge.  The complaint and the investigation will be handled with sensitivity, and confidentiality will be maintained throughout the investigative process, to the extent practical and appropriate under the circumstances, in light of the important privacy interests of all concerned.
>
> TOA (USA)'s policy equally prohibits harassment on the basis of race, color, religion, national origin, sexual orientation, age and/or disability.
>
> Any associate who has any concerns or questions about this policy should talk with Human Resources and refer to the Policies on Harassment and Sexual Harassment.

*Id.* at 210.

**Plaintiff's Complaint of Discrimination**

During his tenure with TOA, Mr. Hnin applied for a Team Leader position in the Stamping Department on three occasions – June 29, 2009, September 30, 2009, and January 6, 2010.  Team Leaders are hourly associates who provide guidance to other hourly associates and direct them in their work, particularly in the absence of the shift

supervisor, and also take a lead role on safety. Mr. Hnin was never selected to be a Team Leader; each time he applied, TOA awarded the open position to an American associate.

On December 14, 2009, Mr. Hnin met with Mr. Clayton, who was then TOA's Executive Director of Manufacturing Operations; Tonda Capps, TOA's Human Resources Manager; and Chris Wernle, the stamping area manager. The purpose of the meeting was to discuss his concern that he and other Chin associates were not receiving Team Leader positions as frequently as American-born associates. Mr. Hnin expressed his specific concern that he and a fellow Chin co-worker, Pacin Thang, had been passed over for a promotion to team leader in favor of an American associate. According to TOA, Mr. Hnin also stated that he believed two Chin coworkers, Pan Thawng and Sang Heu, should have been selected for Team Leader positions. Mr. Clayton responded to Mr. Hnin's assertions by explaining that TOA selected what it believed to be the best qualified candidates and that there had been no discrimination. Mr. Clayton also advised Mr. Hnin that Thawng and Heu should address any issues they may have directly with the company, if they had concerns. Not long after this discussion, Thawng and Heu were both promoted into Team Leader positions, despite neither having applied for those particular positions. However, in the nine years between 2001 (when TOA began doing business in Indiana) and 2010 (when Mr. Hnin was terminated), TOA never hired or promoted into a management position any Chin speaking employees.

In November 2010, Mr. Hnin again complained to his direct supervisor, Javier Morera, as well as a TOA vice-president that American associates were not required to follow TOA's 5S Policy requiring that they clean their work areas ten to fifteen minutes

4

before the shift change, while Chin associates were held to this standard.  According to Mr. Hnin, the first shift team leader, Jack Murphy, never did any cleaning.  Mr. Hnin confronted Mr. Murphy about this and Mr. Morera intervened, but did not instruct Mr. Murphy to clean the space.  The vice-president happened to be passing by during this discussion and Mr. Hnin showed him the unkempt work area left by the first shift.  Mr. Hnin testified that Mr. Murphy begrudgingly returned to help Hnin and the second shift associates in their cleanup efforts.  Mr. Murphy's anger about the incident and Hnin's communications did not go away quickly and, according to Mr. Hnin, they negatively affected their relationship thereafter.

**Plaintiff's Termination**

In October or November 2010, April Brock began employment at TOA as a Staffmark temporary employee.  Ms. Brock worked approximately 20-24 feet from Mr. Hnin's work station and shared the same supervisor, Mr. Morera.  Ms. Brock did not work on the same type parts as Mr. Hnin, and, according to Ms. Brock, she did not talk to Hnin during work or on breaks other than to exchange greetings; she reportedly had virtually no working relationship with Mr. Hnin.

On December 10, 2010, Ms. Brock reported to the onsite Staffmark representative, Daniel Benefiel, that Mr. Hnin was harassing her and had been doing so for some time.  Mr. Benefiel reported Ms. Brock's complaint to Ms. Capps in TOA's Human Resources Department, which prompted an investigation by Ms. Capps and Mr. Clayton.  During that investigation, Ms. Brock stated that Mr. Hnin had made inappropriate comments to her since she began working at TOA on November 10, 2010, and that she had tried to

5

ignore his comments and had also asked him to stop doing so on several occasions. Ms. Brock reported to Ms. Capps and Mr. Clayton that, despite her requests, Mr. Hnin continued to direct offensive comments and gestures toward her. The subject of the harassment frequently related to a married coworker, Steve Miller. According to Ms. Brock, Mr. Hnin would put his two index fingers together, suggesting that Mr. Miller and Ms. Brock were together; he would also make kissing noises and kissing faces to suggest the same. He sang the song, "Oh, My Darling, Oh, My Darling," when Ms. Brock and Mr. Miller were together, and on one occasion as Ms. Brock was coming out of the bathroom, said, "that was a quick one," as Mr. Miller walked around the corner behind her. Ms. Brock reported that this behavior had been ongoing for approximately four to six weeks. In her deposition, Ms. Brock characterized Mr. Hnin's behavior as "childish." Brock Dep. at 64.

     Ms. Brock also told Ms. Capps and Mr. Clayton that she had seen and heard Mr. Hnin yelling at another female associate, although she did not understand what he was saying as he was speaking in Chin. According to Ms. Brock, as Mr. Hnin yelled he swung a handwork part up into the air and appeared to be swinging it at the associate. The associate's back was to Ms. Brock but she could see that that the associate was "shivering like a leaf" after this encounter. Brock Dep. at 77. Ms. Brock also reported that Mr. Hnin often instructed his coworkers to slow down the pace of their work so they could work more overtime. Ms. Brock identified several coworkers who had witnessed such behaviors from Mr. Hnin, including Mr. Miller, José Hereida, and Asuncion Fajardo.

6

After interviewing Ms. Brock, Ms. Capps and Mr. Clayton continued their investigation by interviewing Mr. Hereida, who stated that Mr. Hnin complained about everything, acted like he was the boss, had a bad temper, and had tossed around handwork parts on at least two occasions.  Mr. Miller was interviewed next, confirming that Ms. Brock's report that Mr. Hnin made remarks suggestive of his (Miller) and Ms. Brock being a couple.  Mr. Miller stated that a few minutes prior to his interview, Mr. Hnin had come up to him and, referencing Ms. Brock, asked, "Where is your girlfriend?"

Mr. Fajardo told Ms. Capps and Mr. Clayton that Mr. Hnin often got angry, acted aggressively, and generally made him uncomfortable.  He further reported that Mr. Hnin had recently told another associate to slow down his work because people wanted to be able to stay to work overtime and that overtime was easy money.  Mr. Hnin told Mr. Fajardo not to work hard because he was getting paid the same amount regardless of how hard he worked, and he then gave Mr. Fajardo an apron and told him to go somewhere and sleep.  When Mr. Fajardo asked Mr. Hnin for help on a job, Hnin would simply walk away without providing any assistance.  Mr. Fajardo told the interviewers that he never wanted to turn around when Mr. Hnin talked to anyone because he was afraid that Mr. Hnin might retaliate.

Ms. Capps and Mr. Clayton interviewed Mr. Hnin on December 10, 2010.  Mr. Clayton told Mr. Hnin about Ms. Brock's complaint(s) and advised him that the company took such issues seriously.  Mr. Clayton explained the investigation process to Mr. Hnin including the fact that interviews of his coworkers had been conducted.  According to Mr. Clayton and Ms. Capps, Mr. Hnin appeared to be aggravated with their report and spoke

in an elevated tone, denying any wrongdoing and asking that all witnesses be brought in so that he could confront them. Mr. Clayton told Mr. Hnin that his request was not in line with TOA's procedure and that no witnesses would be brought to the meeting. Mr. Clayton also told Mr. Hnin that his coworkers had reported that he had been aggressive with various associates, that his coworkers were fearful of him and felt intimidated, and that he had directed employees to slow down the pace of their work so they could earn more overtime. Mr. Hnin insisted that Mr. Clayton bring in all witnesses and interview them in his presence. At that point, in light of the serious nature of the information gathered in the investigation and Mr. Hnin's behavior during his interview, Mr. Clayton decided to terminate Hnin's employment. When Mr. Clayton advised Mr. Hnin that he was being terminated, Hnin responded by reiterating his request that he be permitted to confront the witnesses, which opportunity was not provided.

**The Instant Lawsuit**

On March 22, 2011, Mr. Hnin filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that TOA had discriminated against him because of his national origin and retaliated against him for complaints of discrimination in violation of Title VII. The EEOC dismissed Mr. Hnin's charge on October 28, 2011 and issued a right to sue notice. On January 25, 2012, Mr. Hnin filed this Complaint in our court.

## Legal Analysis

### I.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if

believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II. Title VII Discrimination

Mr. Hnin alleges that he was discriminated against based on his national origin, in violation of Title VII.  A plaintiff may establish a case of discrimination using either the direct or indirect method of proof.  Mr. Hnin has chosen to proceed solely under the indirect method.  Thus, we follow his lead and discuss only that method of proof.

To establish a prima facie case of discrimination using the indirect method, as set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), a plaintiff must establish that: (1) he was a member of a protected class; (2) he adequately performed his employment responsibilities; (3) despite adequate performance, he suffered an adverse employment action; and (4) he received different treatment than similarly situated persons who were not members of the same protected class.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted).  If the plaintiff is able to make such a showing, the burden shifts to the employer to come forth with a "legitimate, non-discriminatory reason" for its actions.  *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010).  If the employer is able to do so, it will prevail unless the plaintiff presents evidence that the employer's given reason is merely a pretext for discrimination.

11

*Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

Here, TOA argues that Mr. Hnin cannot establish a prima facie case of discrimination because none of the comparators he identifies were similarly situated to him or treated more favorably. TOA further contends that even if Mr. Hnin could succeed in making such a showing his claim fails because he is unable to establish that its reasons for terminating his employment were pretextual. We address these arguments in turn below.

Mr. Hnin alleges that he was treated less favorably than four American-born employees. Despite the fact that, like Hnin, all four of Mr. Hnin's identified comparators were terminated by TOA as a result of their conduct, Hnin contends that they were treated more favorably than he in that they were provided more opportunities to improve their behavior before being terminated and/or given that TOA conducted lengthier investigations as to each of them prior to their terminations.

Mr. Hnin's first proposed comparator, Tom Smith, made offensive comments towards a female coworker in April 2007, including stating that he would "skull fuck" the associate and referring to the associate as a "dumb fuck," "panty sniffer," and "stupid ass." Similar to Mr. Hnin, Mr. Smith was terminated without prior warning or having previously received any disciplinary sanction(s). Mr. Hnin contends that TOA's failure to fire Mr. Smith the same day the complaint was lodged against him, waiting instead until the next day, Mr. Smith was treated more favorably than was he. We do not regard a discrepancy of one day to be significant, particularly given that Mr. Hnin has adduced

12

no evidence to establish that TOA's investigation of Mr. Smith was more thorough than that afforded Mr. Hnin.

The next comparator proposed by Mr. Hnin is Scott Reed. Mr. Reed was terminated in October 2010 for yelling at a female temporary employee. Mr. Hnin alleges that Mr. Reed was treated more favorably by TOA in that Reed was given warnings about his temper prior to being terminated. In evaluating whether two employees are directly comparable, a plaintiff typically must show that a comparator had the same supervisor; was subject to the same standards; and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Here, in contrast to Mr. Hnin, who was one of TOA's several hundred hourly production associates, Mr. Reed served as an accounting manager possessing specialized skills and reporting directly to TOA's Chief Financial Officer. Thus, Hnin and Reed were employed in different departments with different supervisors and very different responsibilities. Based on these variables, we do not regard Mr. Reed and Mr. Hnin as comparable.

Mr. Hnin's remaining two comparators are Travis Vollmer and George Cross. Mr. Vollmer was terminated in March 2007 after hitting a male associate in the chest with his fist and pulling on his shirt. Mr. Cross was terminated in June 2010 after arguing with and physically threatening a male coworker. Mr. Hnin contends that Mr. Vollmer and Mr. Cross received more favorable treatment by TOA in that both men received warnings for their involvement in prior arguments with coworkers before being terminated. TOA

13

contends that the conduct of Mr. Vollmer and Mr. Cross did not involve sex-based harassment and further that the conduct for which they received warnings was not severe since it involved arguments among coworkers occurring on the factory floor and thus was distinguishable from that of Mr. Hnin.  Mr. Hnin, in contrast, engaged in sex-based harassment in addition to other serious incidents of intimidation and threats towards other employees as well as undermining the effective performance of other employees by instructing them to work more slowly in order to earn more overtime.  TOA points out that when he was interviewed about his behavior, Mr. Hnin failed to take responsibility for his actions, demanding instead to confront the witnesses.  These differences both in the severity and in the nature of the conduct among Mr. Hnin, Mr. Vollmer, and Mr. Cross defeat any claimed comparison.  Thus, Plaintiff has failed to establish the fourth prong of the prima facie test.

Even if Mr. Hnin could establish a prima facie case of discrimination, he has fallen short in establishing that TOA's proffered nondiscriminatory reason for terminating him, to wit, that he violated the company's policy against harassment of fellow employees, including sexual harassment, is pretextual.  Mr. Hnin maintains that he has shown pretext based on the fact that the reasons given for his termination had no basis in fact and were insufficient to warrant termination under TOA's anti-harassment policy.  Further, he claims that TOA did not sufficiently investigate the allegations made against him, to wit, that he intimidated and threatened other coworkers.  Finally, he contends that the comparator evidence cited by him establishes that TOA did not enforce its policy against harassment in an even-handed fashion.

Mr. Hnin maintains that a genuine issue of material fact exists regarding whether his conduct toward Ms. Brock rose to the level of harassment prohibited under TOA's harassment/sexual harassment policy. He claims that he was merely teasing Ms. Brock and that no other employee at TOA has ever been terminated for similarly mild behavior. Seventh Circuit law holds, however, that "[t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citations omitted). Thus, there is simply no evidence from which we can conclude that TOA did not honestly believe that Mr. Hnin's frequent, persistent, offensive and unwelcome comments to Ms. Brock were motivated by her gender and/or that they hindered her work performance. That behavior coupled with the allegations by other employees that Mr. Hnin threw parts on more than one occasion and that his coworkers felt intimidated and threatened by him, fell easily within the company's policy prohibiting harassment/sex harassment. Although Mr. Hnin criticizes the nature and extent of the investigation conducted by TOA, the record establishes that the company interviewed a number of Hnin's coworkers as well as Hnin himself before making the termination decision. Although the investigation was not lengthy, the company viewed the results of its investigation as sufficient to warrant Mr. Hnin's immediate termination. We cannot say as a matter of law or fact that their investigation was inadequate.

Similarly, we are not concerned that TOA did not use a progressive discipline system in addressing and punishing Mr. Hnin's conduct. The failure to apply such a system does not in and of itself establish pretext. TOA's policies permit a discharge for

15

the type of misconduct Mr. Hnin was found to have committed and TOA's policies further provide that, although progressive discipline is the standard procedure, the company has the discretion to skip disciplinary steps and proceed directly to discharge. Given these facts, we cannot conclude that TOA's failure to utilize the progressive discipline approach in Mr. Hnin's case constitutes evidence of pretext. The company clearly did not violate its own policies in choosing to discharge him after a single offense. *Cf. Hague v. Thompson Dist. Co.*, 436 F.3d 816, 828 (7th Cir. 2006) ("Because [the defendant] did not violate its own policies, [terminating for a first offense rather than applying progressive discipline] does not constitute evidence of pretext.") (citations omitted). There is no evidence to support a finding that TOA did not honestly believe that Mr. Hnin's behavior toward his coworkers coupled with his uncooperative response when being interviewed during the investigation into Ms. Brock's complaint justified his termination.

Even if the evidence relating to Plaintiff's alleged comparators showed that in some respects they were treated differently by TOA, Plaintiff still could not meet his burden to establish that TOA's proffered reason for his termination was merely a pretext for discrimination. Such comparator evidence can be seen as relevant to the pretext inquiry. However, the comparator evidence considered by itself is insufficient to establish pretext. Such comparative evidence "is dispositive for summary judgment purposes only if it shows systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic." *E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 151 (7th Cir. 1996) (internal quotation marks and

16

citations omitted). Here, the evidence at best shows that TOA may have exhibited leniency toward other employees on one or two occasions by providing them a warning before termination for conduct that was comparable to Mr. Hnin's behavior. This standing alone is simply insufficient to show that TOA's proffered reason for discharging Mr. Hnin was false and merely a pretext for national origin discrimination.

### III.     Title VII Retaliation

To establish a claim for retaliation under the direct method of proof,[2] a plaintiff must prove that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal relation between the two. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). Where, as here, there is no direct evidence of retaliation, the Seventh Circuit has identified several types of circumstantial evidence that may be considered as establishing a retaliatory motive, including "suspicious timing, ambiguous statements oral or written, … and other bits and pieces from which an inference of [retaliatory] intent might be drawn"; "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman*, 667 F.3d at 860 (internal quotation marks and citations omitted).

TOA does not dispute that Mr. Hnin engaged in protected activity in December 2009 when he complained that Chin associates were not receiving promotions with the

---

[2] Mr. Hnin does not address the indirect method of proof in his briefing; thus we need not address it here.

same frequency as American-born associates and that he was fired approximately one year later, in December 2010. Thus, the only issue is whether Mr. Hnin can establish a causal connection between those two events.

Here, Mr. Hnin relies primarily on evidence already rejected by the court in analyzing his discriminatory termination claim, namely, that TOA conducted a faulty investigation before terminating him and that similarly situated employees who did not engage in statutorily protected activity were treated more favorably. However, those arguments fail for the same reasons discussed above in reference to Mr. Hnin's discrimination claim. Thus, all that remains is Mr. Hnin's contention that the one-year time span between his protected expression and his termination does not defeat his claim for various reasons. Even if we were to accept that Mr. Hnin has established suspicious timing, it is well established under Seventh Circuit precedent that "[s]uspicious timing alone rarely is sufficient to create a triable issue" and "mere temporal proximity is not enough to establish a genuine issue of material fact" at the summary judgment stage. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quotation marks and citations omitted). Mr. Hnin has failed to identify any other evidence that would generate suspicions regarding TOA's actions. Thus, his retaliation claim cannot survive summary judgment.[3]

---

[3] In support of his discrimination and retaliation claims, Mr. Hnin also cites statistical evidence showing that by 2010, although approximately 23% of TOA's associates in its Mooresville facility were Asian or Chin speaking, no Chin associates had ever held a management position, held positions in the front office, or even held low-level team leader positions. However, as TOA points out, the Seventh Circuit has "rejected efforts to use statistics as the primary means of establishing discrimination in disparate treatment situations..." *Bell v. E.P.A.*, 232 F.3d 546, 552

## IV. Conclusion

For the foregoing reasons, we <u>GRANT</u> Defendant's Motion for Summary Judgment. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: __10/31/2013__

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

(7th Cir. 2000). Moreover, Mr. Hnin fails to provide any evidence regarding the number, if any, of Chin-speaking individuals who were qualified for and applied for positions in management or in the front office. Accordingly, this statistical evidence is insufficient to save either of Mr. Hnin's Title VII claims.

19

Distribution:

Robert S. Rifkin
MAURER RIFKIN & HILL P C
rrifkin@mrhlaw.com

Clinton E. Blanck
MAURER, RIFKIN & HILL P.C.
cblanck@mrhlaw.com

Brett Edward Buhl
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brett.buhl@odnss.com

Kenneth B. Siepman
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kenneth.siepman@odnss.com